## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DORA SOTO, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12-cv-01336 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF AURORA, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Dora Soto brought this suit against the City of Aurora, alleging workplace discrimination and harassment on the basis of age (Count One) in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, and workplace discrimination and harassment on the basis of national origin and race (Counts Two and Four) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, respectively.[1] R. 1, Compl. at 11-18.[2] She also brings a Title VII retaliation claim (Count Three). *Id.* at 15-16. The City moves for summary judgment on all claims. R. 27. For the reasons that follow, the City's motion is granted in part and denied in part.

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

[2]Citation to the docket is "R." followed by the docket entry. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for the City's Statement of Facts) [R. 29], "Pl.'s Resp. DSOF"(for Soto's response to the City's Statement of Facts) [R. 37], "PSAF" (for Soto's Statement of Additional Facts) [R. 38], and "Def.'s Resp. PSAF"(for the City's Response to Soto's Additional Facts) [R. 40], followed by the paragraph number.

# I. Background

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to the non-movant, Soto. Dora Soto is a Hispanic woman who was born in Mexico in 1967. DSOF ¶ 1. Although Soto is currently employed by the City of Aurora as an administrative secretary, she was previously a probationary employee in the City's telecommunications department (Telecom) from May 23, 2011 to October 24, 2011. *Id.* ¶¶ 1, 24, 37. Telecom in Aurora is responsible for, among other things, answering all 911 calls and dispatching police officers and the fire department. *Id.* ¶ 10.

To advance within Telecom, new hires, called probationary employees, are put on a 34-week training program. *Id.* ¶ 14. That program consists of multiple-week training phases, including call-taking training, fireboard training, and police dispatch training, and is overseen by certified training officers. *Id.* at ¶¶ 14-15. Each day, a probationary employee's Training Officer completes a daily observation report (DOR), in which the Training Officer rates the trainee's performance in specific areas, using a one-to-five scale (five being the best), and also adds commentary. *Id.* ¶¶ 16, 17. The Training Officer and the probationary employee then review the day's DOR together. *Id.* ¶ 16. The emergency dispatch supervisor (who is in charge of overseeing the department's daily activities and coordinating training) also reviews those reports with Training Officers and probationary employees every two to three weeks. *Id.* ¶¶ 10, 13, 16. If probationary employees pass the training program, they attain the rank of TCI, or telecommunications operator I. *Id.* ¶¶ 10, 14.

In April 2010, Soto was hired as a probationary employee for a TCI position. *Id.* ¶ 20. Although she was hired in April, she did not start working in Telecom until over a year later. *Id.* ¶ 24. Instead, the City decided to delay her transfer because it planned to move Telecom into a new facility with new telephone and computer systems, and believed that it was inefficient to ask Soto to start training on soon-to-be obsolete systems. *Id.* ¶ 22. When Soto asked Lieutenant Nicholas Coronado—who at that time supervised Telecom—why she was not given a prompt start date, Coronado told her that she was "no spring chicken," and explained that it was best for her to wait until Telecom was moved into the new facility because "it will be easier for [her] to learn the new system without having to remember the old system because as we get older, we tend to not grasp new concepts." Pl.'s Resp. DSOF ¶ 10; DSOF ¶ 23; R. 43-1, 8/23/12 Soto Dep. 108:23-109:7, 109:24-110:3.

Soto eventually began training in May 2011. DSOF ¶ 24. Her assigned Training Officers were Barbara Mitchell, Laurie Davis, and Tracie Whalen, who are all white and about the same age as Soto (Mitchell and Davis were both born in 1966 and Whalen was born in 1969). *Id.* ¶¶ 15, 26. This was not Soto's first stint in Telecom—she previously worked as a Telecom operator from 1993 until 2002, when she transferred to other customer-service and administrative positions within the City, *id.* ¶ 4—but her second go-round went much less smoothly than her first. Throughout her training, Soto's Training Officers consistently rated her with 2s and 3s (out of a best-is-5) on her DORs in the areas of information processing, decisionmaking, problem solving, call taking, and multitasking. *Id.* ¶ 30. After about two-and-a-half months of bad reviews,

Diana Tousignant—Telecom's emergency dispatch supervisor during Soto's training—issued Soto two Performance Improvement Plans (PIPs); the first PIP had apparently miscalculated how long Soto had been in training. *Id.* ¶¶ 13, 31-32. Soto's revised PIP was intended to help her improve her call-taking skills by giving her one-week training extensions, which allowed Tousignant and Soto's Training Officers to decide at the end of each extension week whether to advance her to the next training phase. *Id.* ¶ 33; R. 30-21, Def.'s Exh. 18.

Despite this PIP, Soto's ratings did not improve and she was not advanced to the next training phase. Soto then complained about her training to various people, both in Telecom and in the City's HR Department, in August and October 2011. DSOF ¶¶ 34, 36. At these meetings, she expressed that she had problems with her equipment and that Telecom operators were talking about her behind her back and being rude to her. *Id.* ¶¶ 34, 36. Members of her union also met with Tousignant and the City's HR Director to discuss Soto's training, where they relayed that Soto believed that Telecom operators were sabotaging her training and that she was not being allowed to learn from her mistakes; she did not wish, however, to file a formal complaint at that time. *Id.* ¶ 35. Indeed, while she was employed at Telecom, Soto never complained that she was being harassed or discriminated against on the basis of her race, national origin, or age. *Id.* ¶ 34.

But in this litigation, Soto testified that, throughout her training, she in fact was discriminated against because of her race, national origin, and age; in other words, Soto did complain about her treatment, but did not complain, back then, that the

4

treatment was based on race, national origin, or age. Within her first month, Soto complained to Tousignant that she had problems hearing through her telephone equipment. *Id.* ¶ 28. Tousignant found no problems with her equipment but offered her a different headset and a customized earpiece. *Id.* ¶ 29. Tousignant testified that "nobody scored [Soto] lower based on that she couldn't hear someone," R. 43-3, Tousignant Dep. 113:7-8, but one of Soto's coworkers testified that not being able to hear "would certainly affect her trainer and her training itself. If you can't hear somebody, that might affect your training." R. 37-1, Pl.'s Exh. 1, Gumz Dep. 31:17-20. And Soto believes that her ratings suffered because trainers assumed that she was not picking up calls fast enough, thus discriminating against her on the basis of age. DSOF ¶ 49.

Besides her technical difficulties, Soto believes that her trainers intentionally rated her poorly no matter what she did. For example, Soto testified about one time where a substitute Training Officer slept for six hours of an eight-hour shift yet still gave Soto a negative evaluation (although the evaluation might not have counted anyway because it was made by a substitute Training Officer). *Id.* ¶ 48. She also complains that out of all of the other probationary employees, she was the only one who was required to memorize "nature" codes, which are computer codes used to identify the type of incoming call. *Id.* ¶ 52. She was also held to a higher standard of spelling performance on reports, *id.* ¶ 53, and was not allowed to use a notepad or so-called "scratchpad" software to take notes on certain calls. *Id.* ¶¶ 54-55. Finally, Soto was yelled at by Whalen for another trainee's error. *Id.* ¶ 75; Pl.'s Resp. DSOF ¶ 75. Soto

5

believes that all of this shows that she was set up to fail because of her race, national origin, and age. *See* R. 36, Pl.'s Resp. at 8, 10-11.[3]

Soto also alleges that she was harassed because of her race and national origin. She testified about several incidents. First, Laurie Davis, one of her Training Officers, berated Soto to "pick up that phone" in a "rather hostile way," and asked Soto if she understood Spanish when Spanish-speaking citizens called. *Id.* ¶ 69. Other trainers also disparaged her by saying, "Dora doesn't know how to look anything up in the system," "Dora doesn't know anything," "[Soto would] never make it through training," and "no one wants to train [Soto]." *Id.* Second, several Telecom operators once laughed at a photograph of children wearing large black mustaches and waiting in line to hit a piñata at a birthday party. *Id.* ¶ 70. When asked what the children were dressed as, one of the Training Officers explained, "[T]hey're Mexicans." 8/23/12 Soto Dep. 40:14-17. Third, Mitchell criticized Soto for "badgering this little old lady whose neighborhood had changed" after Soto took a call from an elderly caller about, in the words used by the caller, a suspicious "Mexican truck" parked nearby. DSOF ¶ 72. Finally, on two occasions, Telecom operator Johanna Voirin feigned what Soto believes was a "Mexican accent" on the phone. *Id.* ¶ 73.

---

[3]The City moves to strike Soto's response brief for violating N.D. Ill. L.R. 7.1, which restricts all filed briefs to 15 pages in length without prior approval from the court. R. 39, Def.'s Reply at 2. The Court notes that Soto's response brief is within the 15-page limit only because it contains 1½-line spacing instead of double spacing. So in reality, the brief is probably closer to 20 pages. If Soto's counsel wanted to exceed the page limit, counsel ought to have moved to file a response brief in excess of 15 pages—such a motion would almost surely have been granted given the number of claims at issue in the City's summary-judgment motion. Nevertheless, in order to decide the City's motion on its merits, the Court denies the motion to strike.

Similarly, Soto alleges that she was harassed because of her age. This alleged harassment came at the hands of Training Officers Mitchell and Whalen. When the City posted an open water-billing position, Mitchell told another Telecom operator (in Soto's presence) to apply for the job because "it is a good way to retire in a water billing position." *Id.* ¶ 74. Soto believes that Mitchell's comments were related to Soto's age because she was present during this conversation and had previously held a water billing position, plus Mitchell said that it was a "cushy job." *Id.*; 8/23/12 Soto Dep. 57:5-18. She also testified that Mitchell told another Training Officer that she did not want Soto to make it through training, which Soto believes was based on age because the comment followed a discussion in which Mitchell became aggressive after Soto asked for a copy of a DOR. *Id.* ¶ 76. Mitchell also asked Soto on a daily basis if she could hear calls, which made her feel old and unable to hear. *Id.* ¶ 78. Finally, Whalen once told Soto that she did not know why Soto had returned to Telecom after so many years because she has to reacquaint herself with the job even after taking a few weeks off. *Id.* ¶ 77.

Ultimately, on October 24, 2011, Soto requested to transfer out of Telecom back to a customer service representative position. *Id.* ¶ 37. In her transfer request letter, Soto stated, "I feel that due to the recent attacks and continued harassment along with the on-going retaliation of the seniority grievance[4] filed before my transfer on May 23,

---

[4]When Soto interviewed for the position, she knew that employees in Telecom would not be happy that she was returning to the department because Soto had filed a union grievance to obtain seniority for her previous period of employment (from 1993 to 2002) in Telecom. DSOF ¶ 21. Seniority in Telecom determines who receives priority when requesting days off,

2011, that the City of Aurora has given me no choice but to remove myself from the position of telecom operator I." *Id.* ¶ 37; R. 30-6, Def.'s Exh. 3.

The City granted her request. DSOF ¶ 37. Soto then had a follow-up meeting with union officials and City HR employees, and sent them more letters, where she further complained that her trainers had treated her poorly, but did not state that she was being discriminated against or harassed because of her age, race, or national origin. *Id.* ¶¶ 38-40. On November 18, 2011, Soto filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights, in which she alleged age and national-origin discrimination, harassment, and retaliation. *Id.* ¶ 2; Pl.'s Resp. DSOF ¶ 2; R. 1-1, Compl. Exh. A. After she received a right-to-sue letter from the EEOC, Compl. Exh. B, this litigation ensued.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn

---

so Soto would be bumping some of her coworkers if her grievance had been granted. *Id.*

from them, must be viewed in the light most favorable to the non-moving party. *Wis. Centr., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## III. Analysis

### A. Race, National Origin, and Age Discrimination

Soto's complaint appears to allege that the City discriminated against her in two main ways: first, by delaying her transfer to Telecom until May 2011 even though she was hired in April 2010; and second, by intentionally preventing her advancement through training and eventually to the TCI position. *See* Compl. ¶ 19. At the outset, the City argues that Soto's delayed-transfer claim is untimely. R. 28, Def.'s Br. at 3. The Court first addresses this threshold issue before discussing whether Soto was discriminated against (because of her race, national origin, and age) during her Telecom training.

### 1. Untimeliness of the Delayed-Transfer Claim

Before filing an employment discrimination lawsuit in federal court, a would-be plaintiff must file an EEOC charge within 300 days of the conduct underlying the discrimination claim. 42 U.S.C. § 2000e-5(e)(1); *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011) (citations omitted). Any complaint of conduct occurring more than 300 days before the filing of the EEOC charge is time-barred. *Id.* (citation omitted). Soto's claim that the City delayed transferring her to Telecom for more than a year because of her age is based on Lieutenant Coronado's statements that she was "no spring chicken," and that "it will be easier for [her] to learn the new system without having to remember the old system because as we get older, we tend to not grasp new

9

concepts." Pl.'s Resp. DSOF ¶ 10; DSOF ¶ 23; 8/23/12 Soto Dep. 108:23-109:7, 109:24-110:3. But even assuming that these comments are evidence that the City discriminated against Soto because of her age, Soto learned that the City was delaying her transfer on July 8, 2010, DSOF ¶ 22, and Soto did not file her EEOC charge until November 18, 2011. Compl. Exh. A. The filing date of her EEOC charge was thus more than 300 days after the conduct underlying Soto's delayed-transfer claim occurred, meaning that claim is time-barred. Perhaps recognizing this, Soto responds that she "is not claiming that the hire/transfer, itself, was discriminatory," but that "she is alleging that she was subjected to ongoing and continuous discrimination after being hired into the position." Pl.'s Resp. at 5. Whether that is an outright concession or not, the delay in effectuating the transfer cannot be the basis of liability because it is time-barred, so the Court moves on to Soto's training claim.[5]

## 2. Discriminatory Training on the Basis of Race and National Origin

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's race or national origin. 42 U.S.C. § 2000e-2(a)(1). Similarly, § 1981 protects the rights of individuals to "make and enforce contracts" without discrimination based

---

[5]To be clear, because "[a]n employee need only file an EEOC charge within 300 days of the last hostile act in a continuous and ongoing hostile work environment," no statute of limitations bars the Court from considering Coronado's "spring chicken" comments as potential evidence supporting Soto's hostile work environment claim. *See Moore*, 641 F.3d at 256 (citations omitted). But as discussed later in this opinion, those comments are irrelevant to the hostile workplace claim.

on race. 42 U.S.C. § 1981(a). Although brought under these separate statutes, Soto's race and national origin discrimination claims are all analyzed under the same basic framework of Title VII. *See, e.g.*, *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007) (collecting cases applying the same prima facie requirements to discrimination claims brought under Title VII and § 1981), *aff'd* 553 U.S. 442 (2008).

Under Title VII, there are two evidentiary paths available to a plaintiff who wishes to stave off summary judgment for the employer: (1) put in enough evidence, whether direct or circumstantial, of discriminatory motive to create a genuine issue of material fact (the so-called direct method), or (2) establish a prima facie case under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the so-called indirect method). *See, e.g.*, *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003) (citations omitted). As discussed below, Soto succeeds under the direct method.

### a. Direct Method

To prove race discrimination directly, Soto must show, either through direct or circumstantial evidence, that the employer's decision to take the adverse job action was motivated by her race or national origin. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003) (citations omitted). The first of these two types of evidence, direct evidence, is evidence that, if believed by the trier of fact, proves discriminatory conduct by the employer without need for inference or presumption. *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (citation omitted). It is essentially an admission by the employer that its adverse employment action was motivated by

discriminatory animus. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citation omitted). Although Soto presents several incidents where coworkers and supervisors talked about Mexicans in some fashion, none of these incidents involved a Telecom decisionmaker admitting that Soto was not advanced in training because of her race or national origin.[6] *See* Pl.'s Resp. at 7. "Such admissions are understandably rare," so like most plaintiffs, Soto must rely on circumstantial evidence of discriminatory intent. *Darchak*, 580 F.3d at 631.

There are generally three categories of circumstantial evidence:

(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

---

[6]In its brief, the City construes *each* act of alleged discrimination that Soto complains as a separate employment action and maintains that none of them were materially adverse. *See* Def.'s Br. at 5-6. But the gist of Soto's discriminatory training claim is that she was kept stuck in place and ineligible for a promotion to other training phases and eventually to the TCI position. *See* Pl.'s Resp. at 10 ("These examples provide evidence that her ability to make it through all the phases of training was purposely derailed."). For the purposes of Title VII, a denial of a promotion is an adverse employment action. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted). And the facts demonstrate that advancement from probationary employee to TCI is a promotion: TCIs are no longer required to master competencies within 34 weeks at the risk of termination, DSOF ¶ 14, they do not have to report to Training Officers, R. 30-18, Def.'s Exh. 15 at 2, and they can accrue seniority (unlike probationary employees, who cannot). R. 30-30, Def.'s Exh. 27 at DEF 331. Because a TCI position offers increased job responsibilities and benefits, the denial of a promotion to that position is a materially adverse employment action. *Cf. Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 649-51 (7th Cir. 2001) (a lateral transfer to a new position involving diminished job responsibilities but with no loss in pay, benefits, or title was a materially adverse employment action).

*Sun v. Bd. of Trs. of the U. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted); *see also Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (citations omitted).

Here, Soto proffers evidence under the first category (suspicious timing, statements, or behavior). *See* Pl.'s Resp. at 6-8. In her brief, she references a "chain of events" beginning with her delayed start date, including "the months of adverse and inadequate training (different from all of her comparators), denial of critical training (offered to her comparators), [and] highly subjective and unwarranted adverse evaluations," and culminating in a "myriad of race and national origin discriminatory remarks and other adverse, unfair and unlawful treatment." *Id.* at 8. This generally described "chain of events" presumably includes Soto's poor performance evaluations, deprivation of additional CPR training, memorization and spelling requirements, the prohibition of the use of notepads and scratchpad software, and her trainers' refusal to account for her equipment problems. *See* DSOF ¶¶ 46, 48-55. But none of this evidence supports the inference that Soto was poorly trained and not advanced *because of* her race or national origin. *See Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1054 (7th Cir. 2006). At most, this evidence bespeaks a plan to set Soto up to fail, as in *Luks* (which Soto cites to), where evidence of fabricated employee criticisms and mysterious documents listing the plaintiff's name alongside soon-to-be-fired employees bespoke a plan to fire the plaintiff. *See id.* at 1053-54. But also as in *Luks*, Soto's facts, standing alone, do not implicate her race or national origin at all and thus do not suggest that she was set up because of a prohibited animus. *See id.* at 1054; *see also Adams*, 324

13

F.3d at 939 ("That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action.").

Soto has, however, identified a separate collection of facts that she believes demonstrates that her training difficulties were caused by the City's discriminatory animus. This separate collection of facts, which were classified by Soto as "direct evidence," are more appropriately discussed here as circumstantial evidence,[7] include (1) the incident involving the photograph of children "dressed up" as Mexicans, (2) Voirin's feigned "Mexican accent," and (3) the incident where Training Officer Mitchell chastised Soto for asking questions of a caller who reported a suspicious "Mexican truck." Pl.'s Resp. at 7.

Although isolated comments aptly described as "stray remarks" in the workplace are generally insufficient to establish a discriminatory motive, a particular remark can provide an inference of discrimination when the remark was (1) made by the decisionmaker (2) around the time of the decision and (3) in reference to the adverse employment action. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (citation omitted). Thus, for the incidents referenced by Soto to qualify as circumstantial evidence that her training was discriminatory, they must have involved Telecom decisionmakers, occurred around the time she was in training, and referenced her failure to advance in training.

---

[7]Although Soto cites *Luks* for the proposition that "evidence which suggests discrimination albeit through a longer chain of inferences" is direct evidence, that language actually describes circumstantial evidence. *See* 467 F.3d at 1052.

Here, the incidents involving the photograph of the children "dressed up" as Mexicans and the feigned "Mexican accent" suffer from the same deficiency: they did not involve a decisionmaker in Soto's training. Soto testified that in July 2011, Kelley Gruca (a Telecom Training Officer) showed a group of operators (including Soto) a photograph of children at a birthday party who wore large black mustaches while standing in line to hit a pinata. 8/23/12 Soto Dep. 38:21-39:12; DSOF ¶ 15. Someone asked, "[O]h, what are they?" 8/23/12 Soto Dep. 40:15. Gruca responded, "[T]hey're Mexicans." *Id.* 40:17. Soto then commented that she felt offended, "and [she] didn't know that you dress up as Mexicans at a party." *Id.* 41:8-11. In response, Erin Ingram, another Telecom Training Officer, "laughed, and she said ha-ha, I think it's funny. It's hilarious. Kelley, I think it's hilarious." *Id.* 41:18-20; DSOF ¶ 15. Ingram, Gruca, and others then laughed. 8/23/12 Soto Dep. 41:24-42:3. Although unfortunate, this incident is not circumstantial evidence that Soto was racially discriminated against in her training because Ingram and Gruca, although Telecom Training Officers, were not Soto's assigned training officers. DSOF ¶ 26 ("Soto's assigned CTOs [Training Officers] were lead operators Barbara Mitchell, Laurie Davis and Tracie Whalen . . . .").[8] Nor does Soto ever allege that Ingram or Gruca served as a substitute Training Officer. *Cf. id.* ¶ 48 (describing how Tara LaFan once acted as a substitute Training Officer). Ingram and Gruca therefore did not rate Soto's daily performance, and were not

---

[8] Although Whalen was present and saw the photograph, Soto did not identify her specifically as participating in any fashion other than perhaps joining in on the laughter. 8/23/12 Soto Dep. 39:19-20; 41:24-42:5.

decisionmakers nor even people who "exercised a significant degree of influence" over the decision not to advance her in training. *Sun*, 473 F.3d at 813 (citation omitted). Thus, the incident involving the photograph does not point directly to a discriminatory reason why Soto was not advanced in training.

The same goes for the incidents involving Johanna Voirin's use of a fake "Mexican accent." Soto testified that Voirin "was [once] speaking to another officer on the phone that was thanking her for running a subject for him . . . through the computer system" and responded, "'[I]t's my job' in a Mexican accent" and laughed. 8/23/12 Soto Dep. 24:23-24, 25:5-7, 10-11. But again, Voirin was not Soto's assigned Training Officer nor a substitute Training Officer, and was thus not a decisionmaker involved in Soto's training. *See* DSOF ¶¶ 26, 48. Therefore, this incident too was not circumstantial evidence of discrimination.

That leaves the incident involving Training Officer Barbara Mitchell and the caller who reported a suspicious "Mexican truck." This is Soto's deposition testimony about this incident:

Q. And what were those other comments?

A. Another specific one was I took a call, and my trainer—the call was for a suspicious truck, and my trainer—you could tell that it was an elderly caller because of her voice. I was asking what was suspicious about the vehicle because the elderly lady said it was a Mexican truck. I asked several times different questions regarding the truck. Is it occupied? Where is it parked? And she [Mitchell] took over the call during this specific call and told me that I was badgering this little old lady whose neighborhood has changed.

8/23/12 Soto Dep. 29:13-24. In Mitchell's written notes accompanying the DOR, she described the incident like this:

> [Soto] asked the elderly caller what she meant by a Mexican [truck]—caller explained about it [adjacent from] the restaurant and how these hooligans were bringing down the neighborhood. CTO [Training Officer] noticed a shift in [Soto's] demeanor and spoke to [Soto] after the call about it. Soto stated that she was just trying to figure out [what] the caller meant by "Mexican." CTO [advised Soto] that we can't change the thinking of an 80-90 [year-old] woman who has [probably] lived in that neighborhood and watched her area decline—we need to leave ethnicity at the door—now race—that is an identifier for officers and medics—so just be careful of tone and wording—we are Switzerland and we can't change the minds of our callers.

R. 30-3, Def.'s Exh. 2 at DEF 783.

Unlike the race-based incidents with Gruca, Ingram, and Voirin, this incident involved Barbara Mitchell, one of Soto's assigned Training Officers. DSOF ¶ 26. Although Tousignant was the supervisor in charge of training and ultimately decided whether Soto advanced in her training, *see id.* ¶¶ 13, 17, Tousignant made advancement decisions after periodic review of the DORs (the daily observation reports generated by the probationary employee's Training Officers) and upon consultation with the Training Officers themselves. *See id.* ¶¶ 16-17. Mitchell, who was one of Soto's Training Officers that rated her daily, thus "exercised a significant degree of influence" over whether Soto advanced in training. *See Porter v. Ill. Dep't of Children & Family Servs.*, 987 F. Supp. 667, 673 (N.D. Ill. 1997) (collecting cases); *see also Hunt v. City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) ("Emanating from a source that influenced the personnel action (or nonaction) of which these plaintiffs complain, the derogatory comments became evidence of discrimination . . . ."). Moreover, this incident

17

occurred on August 15, 2011, *see* Def.'s Exh. 2 at DEF 775, six days before Tousignant issued Soto a revised Performance Improvement Plan. *See* Def.'s Exh. 18. The incident therefore occurred around the time that Tousignant decided not to advance Soto to the next training phase. So two of the three elements determining whether this "stray remark" is circumstantial evidence of discriminatory motive are satisfied; the only remaining question now is whether this incident was "in reference to" the decision not to advance Soto. *Gorence*, 242 F.3d at 762 (citation omitted).

Although it is a close call, the Court concludes that a reasonable jury could find that Mitchell's remarks were made "in reference to" the advancement decision. Here is why. In viewing this evidence, a reasonable jury could draw two competing inferences, the first of which favors the City: Mitchell advised Soto to stay neutral (like Switzerland) when handling phone calls—despite, Mitchell implied, Soto's personal background—and refrain from challenging callers who are stuck in their backward ways. In fact, on Soto's DOR that day, Mitchell commented that Soto had "great customer service skills," and rated her a 4 in "Interpersonal Relationships," thus indicating that Mitchell was merely offering Soto constructive feedback and not penalizing her for the incident. Def.'s Exh. 2 at DEF 775-76. If a jury drew that inference from these facts, then it could reasonably determine that the comments were not a proximate cause of Soto's failure to pass training and thus were not made "in reference to" the adverse employment action. *Cf. Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) ("To be probative of discrimination, isolated comments must be

18

contemporaneous with the discharge or *causally related* to the discharge decision making process." (emphasis added and citations omitted)).

But a reasonable jury could also draw a competing inference from these facts that cut the other way. This inference favors Soto's case: by scolding Soto for asking the caller for more details about why a "Mexican truck" was suspicious, Mitchell endorsed the caller's views and equated Mexicans with suspicion and hooliganism. Indeed, Mitchell commented on Soto's DOR that she advised Soto that "we can't change the thinking of an 80-90 [year-old] woman who has [probably] lived in the neighborhood *and watched her area decline*," which can be read to say that Mitchell further agreed with the caller that her neighborhood declined after more Mexicans began moving in. *See* Def.'s Exh. 2 at DEF 783 (emphasis added). And although Mitchell scored Soto a 4 for "Interpersonal Relationships" that day, this category partly reflects "the trainee's ability to interact with *other employees* at every level" and not just the trainee's ability to interact with callers. *See* Def.'s Exh. 15 at DEF 708 (emphasis added). In fact, that same day Mitchell gave Soto scores of 2 and 2+ in "Information Processing," "Decision Making and Problem Solving," and "Call Taking and Phone Skills," Def.'s Exh. 2 at DEF 775, and those categories, according to the Telecom Training Manual, more accurately assess Soto's interactions with callers. *See* Def.'s Exh. 15 at DEF 708-10.

Thus, a jury who believes that Mitchell shared the caller's discriminatory beliefs about Mexicans could reasonably find that Mitchell penalized Soto on her DOR for questioning those beliefs—which raises the specter that all of Soto's DORs from Mitchell were similarly tainted by discrimination against Mexicans. And because

19

Tousignant considered Mitchell's ratings and consulted with Mitchell in deciding whether to advance Soto, *see* DSOF ¶¶ 16-17, Mitchell's discriminatory beliefs[9] could have been a proximate cause of Soto's inability to advance in training. Ultimately, a reasonable jury drawing these inferences could find that Mitchell's comments referred to the adverse employment action Soto complains of, thus finding that Mitchell's comments are circumstantial evidence of discriminatory intent.

To be sure, in order to reach that conclusion from the "Mexican truck" admonishment, the jury would have to accept a long chain of inferences in Soto's favor. But by its very nature, circumstantial evidence often requires a jury to draw a longer chain of inferences than direct evidence requires. *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006). More importantly, in deciding the City's motion for summary judgment, the Court must view the evidence in the light most favorable to *Soto* and draw all reasonable inferences in her favor. Certainly at trial, a reasonable jury (which will not give Soto the benefit of the doubt and instead will hold her to her burden of proof) could credit entirely the City's interpretation of Mitchell's comments, or believe that Mitchell's comments were not a proximate cause why Soto did not advance in training (perhaps because Mitchell was only one of three assigned Training Officers). But—and the Court re-emphasizes that it was a close call—it is also possible for a reasonable jury to credit the competing inference that Mitchell shared

---

[9]It bears repeating that the Court is not finding that Mitchell held discriminatory views of Mexicans; this description is solely for summary-judgment evaluation purposes, so the evidence is being viewed in Soto's favor, a requirement that does not apply to the jury.

the caller's views about Mexicans and berated Soto for questioning them. At the summary-judgment stage, that is the inference that the Court must adopt. The Court also notes that the City has not advanced any alternative arguments why it would not be liable even if Mitchell's comments were construed as evidence of discrimination. Accordingly, Soto has presented sufficient circumstantial evidence of race discrimination to survive summary judgment as to her discriminatory-training claim. The City's motion for summary judgment on Soto's race and national origin discrimination claims is therefore denied.

### 3. Discriminatory Training on the Basis of Age

As with her Title VII and § 1981 race discrimination claims, Soto may try to proceed directly or indirectly on her ADEA age discrimination claim. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (citation omitted); *see also Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321 (7th Cir. 2003) (citations omitted) (applying the Title VII framework to an ADEA discrimination claim). This time, however, Soto does not have enough evidence under either evidentiary path.

### a. Direct Method

Remember that under the direct method, Soto may meet her burden of proof by offering direct evidence of animus based on her age—essentially the "smoking gun"—or circumstantial evidence which establishes that the City held an age-based discriminatory motive through a longer chain of inferences. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297-98 (7th Cir. 2010) (citation omitted). The only specific evidence of alleged age discrimination that Soto offers—besides the general "chain of

events" already described and rejected above—is the incident involving Lieutenant Coronado's comments in May or June 2010 that the City was delaying Soto's transfer because she was "no spring chicken," and "it w[ould] be easier for [her] to learn the new system without having to remember the old system because as we get older, we tend to not grasp new concepts." DSOF ¶ 23; *see also* Pl.'s Resp. at 6-8.

But Coronado's comments are insufficient evidence for Soto to survive summary judgment under the direct method. They were made to Soto before her training even started, so they are not a direct admission that she was discriminated against because of her age *during her training*—which is the only claim that Soto has timely brought. And because "stray remarks" must again be made by a decisionmaker around the time of the contested decision, *see, e.g.*, *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citations omitted), the in-the-past timing of Coronado's statements also means that they are not circumstantial evidence of discriminatory training. Indeed, although Coronado supervised Telecom at the time he made those comments, he was succeeded as Telecom supervisor by Lieutenant Keith Cross *before* Soto started as a probationary employee. DSOF ¶ 10; Pl.'s Resp. DSOF ¶ 10. Coronado was therefore not a "decisionmaker" for purposes of Soto's discriminatory-training claim. Thus, because Soto lacks both direct and circumstantial evidence of an age-based discriminatory motive, Soto cannot prove her age-discrimination claim under the direct method and must proceed indirectly.

### b. Indirect Method

Under the indirect method, the plaintiff carries the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. To establish a prima facie case, Soto must offer evidence that (1) she is a member of the protected age group (40 years old or older), (2) her job performance met the City's legitimate expectations, (3) she nevertheless suffered an adverse employment action, and (4) the City treated similarly situated individuals under 40 more favorably. *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (citation omitted). Once a prima facie case is established, the burden of proof shifts to the City to articulate a legitimate, nondiscriminatory reason for its action. *Id.* (citation omitted). If the City does so, the burden shifts back to Soto, who may challenge the stated reason as a pretext for discrimination. *Id.* (citation omitted). Soto is over 40 years old, DSOF ¶ 1, so the focus is on the other three elements.

Assuming (without deciding) that Soto has proven that she met the City's legitimate performance expectations and suffered an adverse employment action, Soto's prima facie case founders because she has not identified another similarly situated individual who was treated more favorably than she was. In her response brief, Soto offers-up two comparators: Wendi Arnold and Alberto Sanchez. Pl.'s Resp. at 11-12. It is true that both Arnold and Sanchez are "substantially younger" than Soto; Arnold was born in 1987 and Sanchez was born in 1981. DSOF ¶¶ 52, 54; *see also Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1118 (7th Cir. 2009) ("In any event, it is [the plaintiff's] burden to establish that his comparator is 'substantially younger'

23

than he for purposes of the ADEA." (citation omitted)). But for Arnold and Sanchez to be similarly situated, Soto must also show that they were subject to the same standards or reported to the same supervisor. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (citation omitted). The match does not have to be perfect, but a difference in decisionmaker can undermine the comparison.

Unfortunately for Soto, the undisputed evidence shows that Arnold and Sanchez were advanced to other phases of training because they reported to a different supervisor and were subject to that supervisor's more relaxed standards. From May 26, 2009 to July 30, 2010, Traci Jackson, not Diana Tousignant, served as Telecom's emergency dispatch supervisor. DSOF ¶ 12. In that role, Jackson supervised training, and made the decision to advance probationary employees to each training phase simply if she believed that the trainee was making progress without the need for intervention from a Training Officer. *Id.* ¶¶ 12, 17; R. 30-41, Def.'s Exh. 36, Jackson Aff. ¶¶ 9-10. Jackson did not require consistent DOR ratings of 4 to advance. DSOF ¶ 17; Jackson Aff. ¶ 11. It was Jackson—and not Tousignant—who advanced Arnold and Sanchez to fireboard training (the next training phase after call-taking) because Jackson believed that they were progressing as necessary and consistently handled 911 calls without intervention from a trainer. DSOF ¶¶ 62-63; Jackson Aff. ¶¶ 15, 20.

In contrast, when Tousignant took over as emergency dispatch supervisor, she made the decision that probationary employees must receive consistent DOR ratings of 4 before they can advance to the next training phase. DSOF ¶ 17. Soto was thus required to meet a different and stricter standard in order to advance to fireboard

training and beyond, but that was because of the change in supervisor. *See* DSOF ¶ 30; R. 30-38, Def.'s Exh. 35, Tousignant Aff. ¶ 14. And Soto has not challenged Tousignant's standard by contending, for example, that she more leniently applied it to other probationary employees after Soto left Telecom.[10] Therefore, it is undisputed that Arnold and Sanchez had to meet a less demanding standard set by an entirely different supervisor to advance in training, meaning they are dissimilarly situated to Soto. *See, e.g.*, *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 626 (7th Cir. 2006) (in a Title VII case, holding that tenured professors were not similarly situated to a non-tenured professor because "there was no evidence they were subject to the same standards for promotion and tenure as [the plaintiff], nor was there any evidence the tenured professors were supervised by the same individuals"). Accordingly, Soto cannot make a prima facie case of age discrimination, so the City's motion for summary judgment on her age discrimination claim is granted.

## B. Race, National Origin, and Age Harassment

The City also moves for summary judgment on Soto's claims that she was harassed because of her race, national origin, and age.

### 1. Race and National Origin Harassment

Title VII prohibits an employer from engaging in racial harassment that creates a hostile working environment. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir.

---

[10]Indeed, undisputed evidence shows that in June 2012 (after Soto transferred out), Tousignant advanced Tracie Lord-Lucas to fireboard training because Lord-Lucas had received a majority of 4 ratings after being issued her own Performance Improvement Plan. DSOF ¶ 67; Tousignant Aff. ¶¶ 20-21.

25

2004) (citation omitted). To survive summary judgment on her harassment claim, Soto must offer enough evidence for a reasonable jury to find that (1) she was subject to unwelcome harassment, (2) the harassment was based on her race or national origin, (3) the harassment was so severe or pervasive as to alter the conditions of her work environment by creating a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (citations omitted). To satisfy the "severe or pervasive" prong, Soto must show that the work environment was both subjectively and objectively offensive. *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003) (citation omitted). In other words, the environment must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (quotation marks and citation omitted).

Soto cannot prove that her workplace environment was so objectively offensive as to constitute severe or pervasive harassment. Soto bases her racial-harassment claim on a number of incidents, some of which have already been mentioned: the photograph of the children at the party, the feigned "Mexican accent," and the elderly caller reporting a suspicious "Mexican truck." *See* Pl.'s Resp. at 13. Other incidents have yet to be discussed. For example, one of her trainers, Laurie Davis, yelled at Soto and belittled her by hostilely telling her to "pick up that phone" and asked Soto if she understood Spanish when Spanish-speaking citizens called. DSOF ¶ 69. In addition, Soto's trainers made statements such as "Dora doesn't know how to look anything up in the system," "Dora doesn't know anything," "[Soto would] never make it through

26

training" and "no one wants to train [Soto]." *Id.* Another time, Tracie Whalen yelled at Soto for a mistake made by Sanchez. *Id.* ¶ 75; Pl.'s Resp. DSOF ¶ 75.

Even assuming that all of these incidents implicated Soto's race or national origin (thus having a "racial character or purpose," *see Luckie*, 389 F.3d at 713), they do not rise to the level of being so severe or pervasive as to support a hostile work environment claim. As to severity, no racial epithets were used in any of the complained-of incidents, much less epithets directed at her. *Compare Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (no hostile work environment where "motherfucking black niggers," "motherfucking niggers," or "black motherfuckers," were used but not directed at the employee), *and Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (hotel supervisor's reference to black music as "wicka wicka woo music," suspicious treatment of African-American hotel guests, and one incident where a co-worker used the word "nigger" in the employee's presence did not constitute a hostile work environment), *with Cerros*, 288 F.3d at 1046-47 (reversing summary judgment for employer on hostile work environment claim where the employee was called "brown boy, spic, wetback, Julio and Javier" by both coworkers and supervisors, where coworkers openly touted the Klu Klux Klan and 'White Power," and where there was racially offensive graffiti on the bathroom walls). Nor were these incidents sufficiently pervasive—over the five months that Soto trained at Telecom, she experienced two or three incidents where Mexicans were explicitly made the butt of jokes (the photo and fake accent incidents) and one incident where she was arguably criticized for questioning a caller's beliefs about Mexicans. The case law dictates that

27

this frequency is insufficiently pervasive to support a claim. *See Peters*, 307 F.3d at 552 (six offensive incidents over one-and-a-half years of employment were not sufficiently pervasive).

When viewed in the light most favorable to Soto, the incidents involving the photograph, the feigned accent, and Mitchell's comments about the elderly caller did display racial insensitivity. But "mere offensive utterance[s]" do not support a hostile workplace claim. *See Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 641 (7th Cir. 2001) (citation omitted). Rather, "[t]he workplace that is actionable is the one that is hellish." *Id.* (quotation marks and citation omitted). Accordingly, no reasonable jury could find that Soto suffered hostile work environment harassment because of her race or national origin, so summary judgment is granted to the City on that claim.

### 2. Age Harassment

Soto also alleges that she was harassed because of her age. The Seventh Circuit has only assumed, but never decided, that plaintiffs may bring hostile work environment claims under the ADEA. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005) (collecting cases). The Court can follow the Seventh Circuit's approach in this case and assume that Soto may bring her an age-harassment claim because, as discussed below, even assuming that such a claim is cognizable, Soto fails to proffer sufficient evidence of a hostile workplace to survive summary judgment.

Soto points to several incidents of alleged harassment based on her age. She again leads off with Lieutenant Coronado's "spring chicken" comments. Pl.'s Resp. at 13. She also believes that Mitchell and Whalen harassed her because of her age

28

because Mitchell once said (to someone else, in Soto's presence) that an open water billing position was "a good way to retire" and is a "cushy job" where one does not have to do anything. DSOF ¶ 74. Soto believes that these comments were related to her age because Mitchell then turned to her and said, "Dora's done that job before." *Id.*; 8/23/12 Soto Dep. 57:5-18. Mitchell also told another Training Officer that "if I have my way, [Soto will] never make it through the training," 8/23/12 Soto Dep. 215:3-5, which Soto believes is also age-based because the comment followed a discussion in which Mitchell became aggressive after Soto asked for a copy of her DOR. DSOF ¶ 76. Mitchell also asked Soto on a daily basis if she could hear calls, which made Soto feel old and unable to hear. *Id.* ¶ 78. Finally, Whalen once told Soto that she did not know why Soto had returned to Telecom after so many years because she has to reacquaint herself with the job even after taking a few weeks off. *Id.* ¶ 77.

Again, to succeed on Soto's hostile work environment claim, she must demonstrate that her workplace was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (quotation mark and citation omitted). Soto has not met her burden. Coronado's "spring chicken" comments can be disregarded right off the bat: the comments were made nearly a year before Soto began working at Telecom by a person who was no longer supervising Telecom by the time Soto started. DSOF ¶¶ 10, 23; Pl.'s Resp. DSOF ¶ 10. Thus, the "spring chicken" comments are irrelevant when assessing Soto's workplace environment as she experienced it at the time of training. As for the other incidents,

29

although Mitchell and Whalen may have made Soto subjectively feel old (for example, by asking her daily whether she could hear the caller, *see* DSOF ¶ 78), she still must show that the incidents were objectively offensive. And Soto admits that Mitchell and Whalen never mentioned or criticized her age at all. *See* Pl.'s Resp. DSOF ¶¶ 74, 76-78. Thus, although Mitchell and Whalen may have been rude or unfair to Soto, their conduct does not rise to the level of objective offensiveness that legally redressible harassment requires. *See Racicot*, 414 F.3d at 676, 678 (comments to the plaintiff that she "shouldn't be working at [her] age" and "if [she] were younger, [she] could pick up the boxes when heavy shipments arrived at the store" did not create an objectively hostile work environment); *Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 828 (7th Cir. 1999) ("Although Commissioner Halloway subjectively may have been offended by the comments about his retirement . . . we cannot say that such comments were, when assessed objectively, sufficiently severe to create a claim."). Thus, the Court grants the City's motion for summary judgment as to Soto's age harassment claim.

## C. Retaliation

Finally, the City moves for summary judgment on Soto's claims of retaliation on the basis of age, race, and national origin. Soto may prove retaliation again either directly or indirectly, but both methods first require her to have engaged in a statutorily protected activity. *See, e.g.*, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663, 666 (7th Cir. 2006). Soto contends that she was retaliated against after her "proper reporting of the adverse and discriminatory treatment," Pl.'s Resp. at 14, but the ADEA, Title VII, and § 1981 only protect employees who complain of discrimination

*because of* their age, race, or national origin. *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) (citation omitted) (discussing the ADEA); *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (citations omitted) (discussing Title VII); *Humphries*, 474 F.3d at 404 (citations omitted) (discussing § 1981). And Soto admitted that she never complained during her training to anyone in HR, any Telecom supervisor, or anyone at the City that she was discriminated against because of her age, race, or national origin. *See* Pl.'s Resp. DSOF ¶¶ 79-80. Although Soto asserts in her Statement of Additional Facts that she submitted an additional letter to the City's HR director on October 26, 2011 (after she requested to be transferred out of Telecom), *see* PSAF ¶ 20, that letter does not complain about harassment or discrimination on the basis of age, race, or national origin. *See* R. 30-33, Def.'s Exh. 30 at SOTO 108. Finally, her request to transfer out of Telecom only mentions that others retaliated against her because of the seniority grievance she filed, and again not because of her age, race, or national origin. Def.'s Exh. 3. These undisputed facts demonstrate that Soto was not engaging in a statutorily protected activity, thus defeating her retaliation claims. Summary judgment is granted to the City for these claims as well.

## IV. Conclusion

For the reasons discussed above, the City's motion for summary judgment [R. 27] is granted as to Soto's age discrimination, harassment, and retaliation claims, but denied as to her discrimination claim based on race and national origin. At the next

31

status hearing, the parties should be prepared to address the case schedule moving forward, including whether a settlement conference is sensible.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: May 17, 2013